5-18-03-01 Charles Baker v. The Workers' Compensation Commission My name is Kermit Poney and I represent Charles Baker, the petitioner. I realize I'm not the usual person you'd expect to see up here arguing these particular black-arm cases. I hope the Court isn't that disappointed. I have not had the privilege that often, but I have big shoes to fill and I'm going to try to do the best job that I can with that. There are enough serious internal contradictions in this decision that the appropriate action is to send this case back to the Commission. The main error, the one which I intend to focus on, is the Commission's unexplained and shifting view of the NIOSH fee reliefs. It began its decision with a clear finding, and I quote, The Commission finds the arbitrator's reliance on the findings of the NIOSH testing results improper, although harmless error. The Commission never explained why reliance on the NIOSH results were improper, but the claimant agrees that reliance on them would be improper. The claimant also concedes that if the Commission had held true to this finding, he would have agreed that it could have been harmless error, but it didn't. The Commission went to the trouble of listing and striking all references to NIOSH readings, but it left in as many as it took out, and every one it left in went to the heart and basis of its decision. That left us with an irreconcilable internal conflict which required a remand to the Commission. One of the decisions of the Commission has to be wrong. The NIOSH readings were either improper or they weren't. The Commission, after finding that reliance on the NIOSH readings was improper, still left the following in its decision, and I quote, the arbitrator notes that all of the NIOSH B readers and A readers found petitioner's x-rays of January 19, 2000, and January 29, 2003 to be negative for CWP. It also found, and I quote, the arbitrator notes that both Dr. Meyer and Dr. Selby reviewed the x-ray of May 4, 2007, interpreted by NIOSH as negative, and likewise found the films to be negative for CWP. It also found, and I quote, Dr. Meyer noted in his report that he compared the 2012 film to the May 2007 film, and it was unchanged. And it also found, and I quote, the interpretations by Drs. Meyer and Selby were consistent with the independent readings by NIOSH physicians. So here's why the claimants is asking that the case be remanded to the Commission. The Commission rightly found that reliance on NIOSH x-ray readings was improper. It may have been because no x-rays could ever be relied on to rule out the existence of CWP. It may have been because the readings weren't timely to answer the actual legal question of whether the claimant had CWP at the end of the Section 1F period, or it may have been both. But regardless of the basis of the finding, for the purpose of this case, by words of the Commission, any reliance on the NIOSH x-rays would be improper. And we know the Commission did rely on these, at least partly, for more critical decisions in this case. Well, why would the NIOSH, the National Institute's, you know, reports be totally irrelevant? Well, we have an opinion as to why. We don't know why the Commission felt the way they did, as far as the arbitrators ruling. As I indicated before, it can be either because, one, because of the slowly progressing disease of CWP, whether or not he had it in 1997 or 2002 really doesn't go to the fact as to whether or not he had it by time in 1F, time it would run out. That's part of what we would like to know, why they felt it was improper. They don't give no reason in their decision. We have arguments as to why we feel it is. We don't know why they ruled that way, and that's part of the reason why we would like the Commission to further... Well, why do you feel it is irrelevant? For the two reasons I just recently stated. One is that there's testimony that an x-ray can never truly rule out CWP. And that's agreed upon by everybody. Exactly. It can't rule it out, but why does it mean it's irrelevant? Well, because whether someone had a disease in 2007 or 1992 isn't really relevant as to whether he had it in 2012. Except if the x-ray shows that he did, you might be arguing that they're admissible, wouldn't you? Well, if he did, then he did, because then it is relevant, because if he has it, you can see it on the x-ray, and if it's relevant then, he's going to have it in 2007, he's going to have it in 2012. And this is a question that runs through all of the black lung cases, maybe you would call it, CWP cases. How then would the respondent ever try and rebut that somebody has it? Given the fact that you're right, the x-rays can't rule out that he has it or may get it, but isn't that something they can present on their side of the case to try and rebut the inference? Or what can they do then? Well, they still have their own experts and view readers to read the x-rays within the two years, and they have testimony that can say either he did or he didn't. I'm just struggling to find why it's completely irrelevant to anything. Well, and that's all part of the reason why we feel that there is a potential for a revamp here, because they didn't explain why they felt it was improper. There had to be a reason why they felt the arbitrator's reliance on him was improper, and they don't give a reason as to why that is. What evidence did you have of the existence of CWP other than Smith and, who was it, Alexander? No, no. I mean Dr. Paul. Paul and Smith. And Alexander, I believe. Yes. What evidence did you have other than the opinions of those three that the 2012 x-ray showed the existence of CWP? Is there any evidence other than that? No other evidence. Well, and he has witnesses, Shelby and Meyer, who testify that the x-rays that were reviewed by Paul, Alexander, and Smith do not show CWP. And so now the question is, if the commission believes his experts that the x-rays do not show CWP, discrediting the opinions of your witness, do you have any evidence that supports the existence of CWP? No, on a strict manifest way, the argument is what you're getting at, I think, Your Honor. No, I think the commission would have the right to choose what experts they want to point here is they did that with using NIOSH records to support those opinions after they said they were the arbitrator and promptly used them in her decision. And that's part of what our argument is here. I was about to actually outline a little bit of that in my argument. Oh, how they relied upon NIOSH. Exactly. Okay. Even after they said they were improper. First, they used it to find the claimant didn't have CWP because the NIOSH x-rays of January of 2000 and January of 2003 were read as negative. Second, to give credibility to the negative view readings of Dr. Meyer and Dr. Selby, because the x-rays of 2007 x-ray was, in quote, interpreted by NIOSH as negative, as it was by both Dr. Meyer and Selby. So, in other words, to your point, if they just believed Meyer and Selby and found them more credible, I wouldn't have as strong an argument as then they used NIOSH to help support that opinion after they said that the NIOSH readings were improperly used by the arbitrator. Can I ask a question? And I see, you know, intellectually, intuitively, your argument has appealed that there's an inconsistency there. But what about this doctrine that we, in the final analysis, review the result that the reasoning? Does that enter into the analysis at all? I think the result is flawed by them incorporating the arbitrator's decision after they said that the arbitrator improperly used evidence to reach that decision. In other words, they didn't re-weigh the evidence, which they could have done. They incorporated the arbitrator's decision with some of the NIOSH opinions in it to help bolster their opinions. They didn't allow their opinions just to stand on their own, just with Mr. Wertz's expertise. So, what do we do with that? In our own minds, we strike that bolstering evidence and consider the other evidence on its own? I think it could be remanded to the commission for them to make their own opinions based on taking out what they felt was improper and just let the evidence stand alone, which they didn't really do. They kind of did or did some, but they, like I said at the end, dovetailed in some stuff that they said was improper from the very beginning. And thirdly, they used it as a basis to bolster its decision to give more credibility to Dr. Meyer's reading of the 2012 x-ray because he compared it to the 2007 bill and it was unchanged. I think I might have actually said that, and I apologize. And fourthly, as a basis of its decision to give the most credibility to Dr. Meyer and Dr. Selby because their readings were, and I quote, consistent with the independent readings by NIOSH physicians. Claimant rests with this criticism of the commission's decision. It found that reliance on the NIOSH readings was improper, yet it did rely on them for critical considerations. Claimant's argument attacks the basis of the commission's credibility determination, which I think is important here because that's what it all comes down to, really, in the end, and asks that this claim be remanded. Thank you. Okay, so to simplify it, the arbitrator relied upon prior NIOSH readings, correct? And in fact, in the decision, it emphasized the fact that that was very persuasive, I believe. In finding no CWP. Yes. And the commission proceeded to criticize the arbitrator's decision, saying you should not have done that, right? Yes. And then they proceeded to make a determination that there was no CWP, not on the basis of bereaders disagreeing on what the film showed, but also bringing in prior NIOSH readings. Yes, Your Honor. In other words, they used the negative NIOSH readings to support respondents' experts of negative readings. Right. Which then, obviously, that does tip the scale some, compared to our experts who did find it, as opposed to just using it expert to expert, which is done sometimes, and not use the other x-rays, which they said were a problem. So you're saying we can't really decide whether that was a pure comparison between competing experts. Exactly. Okay. I see the paragraph where they find that the arbitrator's reliance on the findings of the National Institute for Occupational Safety and Health testing results improper or harmless error. So where does it say, call my attention to where does it say in here that they then relied on it, turned around and relied on it? The quotes, Your Honor, are from the actual... Do you know what paragraph that was? I apologize. I do not have the paragraph. I apologize. Okay. I'm having trouble finding the specific paragraph, Your Honor. They say toward the end, before the concluding paragraph, the Commission strikes those parts of the arbitrator's decision referencing reliance on the NIOSH results. So where did they turn around and say we relied on them? In other words, they struck the second, fourth, and fifth sentences in the paragraph they talk about, but the quotes that I gave you were still in the arbitrator's decision that they incorporated, which would have been based on the NIOSH. Yes. So you're saying there's an internal inconsistency, is that the gist of your position? Exactly. Anything else from the Court? No, I don't think there are. Thank you. You will have time in reply, if I may, Judge Clark. Mr. Wirtz, response? I'm sure you'll address the overarching issue hanging in the air about this internal inconsistency he's relying on. I will do my fair share, Your Honor. May it please the Court, Mr. Coney. My name is Ken Wirtz, and I represent the Appalachian American Folk. We know that co-workers' endometriosis is a chronic, slowly-progressing disease. You have that evidence in this case as well with the testimony of Dr. Monner. I don't think there's any dispute about that. The NIOSH films that were offered, or interpretations that were offered into evidence, begin with a chest x-ray in 2000, and there was one in 2003 and one in 2007, and this gentleman left work in 2012. The earlier films of this gentleman are relevant in regard to whether he has a chronic disease. We all agree that co-workers' endometriosis is present with chronic disease. It's slowly-progressing. I think it was a error for the Commission to strike that language regarding those films for that reason alone, but I agree that either way, it's harm and favor. And I say that for this reason. If you look at the Commission... So what you're saying is that they were wrong in chiding the arbitrator for looking at them, right? Yes. Okay. Because they... Because I think it is relevant. Now, they didn't really say the basis for striking it. I'm presuming it's relevant, but I don't know of another basis. Those records came in by certification. I mean, it's not a... They were a business record. It's not a hearsay objection that was made. I think if you went back and looked, well, there was no objection to them in arbitration. And I would have to say it was relevant that they were striking them. But I think that, as you know from these arguments, when you're talking about chronic, slowly-progressing disease, it's hard to say that serial films of someone looking specifically for that disease aren't relevant. But I think all of that is harmless air, whether you agree with the Commission and what they struck, or the Commission striking those interpretations, I think, is harmless air. And I'm saying that... But I think the beef, so to speak, is that once they did that, then somehow in fashioning their decision to deny benefits, they implicitly or explicitly referenced them. Right. And I'd like to address that. I mean, see, maybe I'm being too simplistic, but... No, I think that was... I'd like to address that. Please do. In the Commission's decision on page 4, the fifth full paragraph of that decision, and let me make some background for this, there was a CT, not just a CT, but a high-resolution CT taken of this gentleman's chest. It was interpreted by Dr. Selby, who's a board-certified pulmonologist and DVD reader, and Dr. Perkins, I believe it was. Excuse me for looking at this. Anthony Perkins, a board-certified radiologist, both looked at that and said there is no evidence of pneumococcus on that CT. The appellant in their brief said, well, with CTs, NIOSH doesn't recognize CTs. That's argument. It's not exactly factually correct. What NIOSH doesn't do with CTs is have that be-reading form. So we call it be-reading. It's actually International Labor Organization form. One week of the day, patient's name, whether there are any abnormalities consistent with pneumococcus, and if there are, their type, their location, their profusion. We don't have that filmed for CTs. But it's not a correct statement to say that NIOSH doesn't recognize CTs as being efficacious for the diagnosis of disease. In fact, in the Department of Labor cases, CT interpretations are admitted all the time. It's just that there is no be-reading form for that. And I have spoken to somebody who was on the original committee that set up the be-reading program, and he told me his opinion as to why there isn't and why there will never be. And if you're interested, I can share that. But it has nothing to do with whether that study is efficacious for the diagnosis of pneumoconiosis. And in this case, you have two interpretations of that study. Both are negative, and it's unrebutted. In the Guides to the Evaluation of Permanent Experiment 6 Edition that we now have to refer to, specifically the chapter on pulmonary disease in Section 5B, and I put this in my brief, but it states that CT scans are a radiographic technique that may augment the standard chest radiograph. And furthermore, the standard CT scans can provide greater accuracy as part of a thorough assessment of the lung parenchyma, the spongy part of the lung. And that's what we're looking at to determine whether pneumoconiosis is present. Dr. Meier was questioned about this in his death, and the efficacy of CT scans. Now, at the time Dr. Meier looked at films of this gentleman, the CT scan had not yet been performed. So if you're wondering, why didn't Dr. Meier say, I didn't have it at the time. And I didn't then later send it to him to re-read. I already had the reading of Dr. Sellery and Dr. Perkins. And so, you know, it's just piled on at this point in time. So Dr. Meier, at the time, didn't have it. He wasn't aware that it existed. But he testified, if all you have on a minor are analog chest X-rays and no CTs, I think you could say that he has not had the most sensitive exam, the exam that has the highest opportunity to identify abnormalities. And then I'll get back then to what I wanted to point out to you with the commission's decision. On page 4, fifth full paragraph, the submission says, The commission is swayed, therefore, by Dr. Selvey's testimony regarding the sensitivity of CT scans for the evaluation of lung corrective. Dr. Selvey testified a high-resolution CT of the chest completed July 31, 2013, and read by Anthony Perkins, MD, a board-certified radiologist, showing no evidence of black lung disease slash co-representative amniosis. Dr. Selvey reviewed the CT of the chest and agreed with Dr. Perkins, who took the patient. And then at page 5 of their decision, first fourth full paragraph, the commission says, The commission finds that the July 31, 2013 CT scan is the best evidence in this case and corroborates the feed readings of Dr. Meyer and Dr. Selvey. And that's why I say, okay, strike the NIOSH readings. Don't strike the NIOSH readings. The commission recognized that the best evidence, the sharpest tool that was used for diagnostic purposes, in essence, the radiologist's counsel, who was a pathologist, was interpreted as negative. And that's it. There was no other interpretation for those CTs. And that CT, by the way, came more than a year after this gentleman last worked, and it was the last imaging that appears in the record for this gentleman. So, counsel, I believe Justice Holder was asking about proposing counsel's argument with regard to bolstering with the NIOSH X-rays. What's your position with regard to the decision referencing material that it struck? Well, I think I'm repeating myself. I think it's actually... Well, I didn't catch it in that. I didn't either. Oh, I'm sorry. I think, number one, it was error to strike that for the reasons... Well, I guess I'm asking, do you agree that this is bolstering use of the struck information? I don't, because I don't come to the same conclusion they do, and certainly that conclusion isn't in the commission's decision. It's what they're interpreting the decision to say. But as I'm trying to point out, it doesn't matter, really, in this case, how any of the X-rays were interpreted. I'm talking now about plain films of the chest, because the evidence is clear, and it's correct medically, from a medical standpoint, that CTs are more sensible. In fact, they'll pick up pneumoconiosis when plain films won't. They'll pick up emphysema when plain films won't. Often, people go in preoperatively and have a screened chest X-ray, and that's being done... Well, what you're saying, that's all detail. It's fine and well and good. But your argument is that, all that aside, forget what the readers, any of them, your readers, their readers, say. NIOSH. NIOSH, forget it. They relied on the best evidence that's medically available to determine the presence or absence of CWP. In this case, that's right. And I don't want to read it again, but, I mean, they say that, and you can go back to page 4, the fifth full paragraph, page 5, the first one. So you're saying a fair reading of, really, the commission's analysis was that they didn't really consider NIOSH. Well, they certainly, by what we can read, without trying to interpret, read between the lines, by what we can read, that they actually said, that is what they said. They said, this is the best evidence, and we're giving that right away. I mean, you can read those two paragraphs for yourself. That is what they're saying. That is what they said. We know that much about what they thought. But, I... So you're saying that that enough would be to support, it would be enough and sufficient enough to support, because it's in the record. I think there, without question, is sufficient evidence to support their denial. Really, in this case, it just, you could have had none of those. Read it. Because the CT really is being messed up. And that's what the evidence is in this case. And that will always be true. And that's where I was going. When people go in for an operation, they have a preoperative test. They check and see if there's any amyloidosis or fluid in the blood. Or perhaps a heart problem. Let me show you. Those sometimes pick up a suspicious nod. And what are those people told? Are they told, you need to go back and have another X-ray? They're told to come get a CT at the chest. And that's because it is more diagnostic, it's more efficacious for finding those small, minute, microscopic changes that are present in the lung, which is what we're looking at here. And it was negative by two people. And then, of course, the condition of the bolsters would be readings that we have from those experts. I don't think there are any further questions. Thank you. Counselor, you may decline. First off, I'd like to say, what Mr. Wirtz argued to a certain degree is what I'm kind of trying to say is, let's take it back to the commission and let's really find out what they had to say, what they really thought, and address these issues specifically. More to the point, what they really relied on. Exactly. Because we're still talking about, well, there's the CT. Well, that's bolstered by the V-readers. Well, those V-readers are bolstered by the NIOSH. So it's still a chain here that... This could have been avoided if they say, we strike and disregard all reference and reliance on NIOSH. But they didn't do that, did they? They did not. And we did... And I don't like reading a brief when I'm up here. But just to highlight, in our brief, we addressed the CT issue a little bit here. And I'll just read just a small excerpt. The commission conceded that there are no protocols for standardizing equipment for CT scans. The cuts used for CTs, according to Dr. Selvey. But the commission failed to cite Dr. Selvey's further testimony that CT scans are not recognized by NIOSH. There are no sample films from NIOSH for comparing positive and negative CT scans. There are no protocols for either. The machines that take the CTs are displayed to them. And there is no radiographic presentation for the intervals between the cuts of the CT scan. So, while the CT is a different way of trying to either rule out CDP or not, I would argue that it may not be necessarily this gold standard that it's important to be here. Also, the harmless error, Mr. Worth referred to, I'm a little confused as to what's the harmless error. Does the arbitrator have the harmless error by leaving them in? Or did the commission create the harmless error by using them in their decision? That's a little murky. Or I would say, if it's a relevance reason, if they ruled it improper as a matter of relevance from the arbitrator, then I would say it is a contradiction. They never specified why, did they? No. Well, it had to have been irrelevant. I'm interpreting, I agree with Mr. Worth, it probably was on the grounds of relevance, which I don't agree with their decision. But, again, you have a conundrum here. So, if the commission finds that the arbitrator erred by relying in any way on NIOSH, but then they relied on it, is it inconsistent? I don't know if they relied on it, but they didn't strike out all of the references later in the arbitrator's conclusions. And by incorporating it, then there is reliance, I would argue. Regardless of any other errors by the commission, it broke its own standard. When it stated that reliance on NIOSH x-rays was improper, and then relied on them at least four times on outcome-determinative issues, the commission must have been wrong either in the statement or in its premise, or in the application of its premise. And I would like to also point out, in concluding, there was a dissent here from Commissioner Tyrell. So, even with the CT scan, there was one dissent that felt that we did prove our case, that there was CDP. Thank you. Thank you, counsel. Both refined arguments in this matter this morning. It will be taken under advisement as a dispositional issue.